IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:16-CR-6-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | ORDER AND MEMORANDUM |
| | ) | AND RECOMMENDATION |
| OSCAR LOPEZ-ESTEFES | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court to address the motions by Defendant Oscar Lopez-Estefes ("Defendant") to disclose the identity of a confidential informant and to suppress all evidence (physical or testimonial) and the fruits thereof that resulted from an unlawful search, seizure, interrogation, arrest, and detention on January 6, 2016 at Defendant's residence at 21 New Mexico Drive, Red Springs, North Carolina ("the residence"). Def.'s Mots. [DE-31, -32]. The Government responded in opposition to Defendant's motions [DE-35, -36] and filed a supplemental response to Defendant's motion to suppress [DE-50] and the undersigned held an evidentiary hearing on December 16, 2016, to further develop the record. [DE-54]. Accordingly, this matter is ripe for review. For the reasons stated below, Defendant's Motion to Disclose Confidential Informant is denied and it is recommended that Defendant's Motion to Suppress be denied.

## I. PROCEDURAL BACKGROUND

On January 8, 2016, a criminal complaint was filed against Defendant, charging that he had shipped, transported, received, and possessed firearms in and affecting interstate commerce while being an alien illegally and unlawfully in the United States in violation of 18 U.S.C §§ 922(g)(5)(A) and 924(a)(2). Compl. [DE-1]. On February 2, 2016, a Grand Jury sitting in the Eastern District of North Carolina indicted Defendant for the same offense. [DE-21]. At the suppression hearing,

the Government presented the testimony of two witnesses: (1) Special Agent Bryan Moultis ("Agent Moultis") of the Department of Homeland Security Immigration and Customs Enforcement ("ICE") and Homeland Security Investigations ("HSI"), who was in charge of the operation on January 6, 2016; and (2) Corporal José Hernandez ("Corporal Hernandez") of the Hoke County Sheriff's Office Gang Unit who assisted Agent Moultis on January 6, 2016 by providing some translation services from English to Spanish. Corporal Hernandez was also wearing a body camera that recorded the encounter, and that footage was submitted as Gov't Ex. 1.[1] The Government submitted four other exhibits: a consent to search form written in Spanish and signed by Defendant (Gov't Ex. 2); a copy of a field interview questionnaire about immigration ("the questionnaire") completed by Defendant (Gov't Ex. 3); a Notice of Abandonment and Assent to Forfeiture of Prohibited or Seized Merchandise signed by Defendant (Gov't Ex. 4); and a DHS Report of Investigation written by Agent Moultis (Gov't Ex. 5). All exhibits were admitted without objection. Defendant did not present any evidence at the suppression hearing.

## II. STATEMENT OF THE FACTS

The following factual summary is taken from the suppression hearing testimony of Agent Moultis and Corporal Hernandez and the body camera footage from Gov't Exs. 1-1 and 1-2 to establish a timeline of the events that occurred on January 6, 2016.

On the morning of January 6, 2016, Agent Moultis, Corporal Hernandez, and four other officers arrived at the trailer park where Defendant's residence was located. Gov't Ex. 1-1 at 00:00. Agent Moultis testified that the neighborhood was a "hot spot" for firearms and narcotics and he had

---

[1] The body camera footage is saved in two files on the compact disc submitted as Gov't Ex. 1. The first portion of the encounter is titled "20160106_0005.MOV" and will be referred to as Gov't Ex. 1-1, and the second portion is titled "20160106_0006.MOV" and will be referred to as Gov't Ex. 1-2.

2

encountered people in that neighborhood in the past who had been deported and had also located illegally-owned firearms in that neighborhood. The officers planned to conduct a firearm and narcotics-related "knock and talk" at Defendant's residence. Six months earlier, an informant identified Defendant's residence as a marijuana distribution point and additionally, during past surveillance, Agent Moultis had seen an individual walk from a trailer he knew to contain drugs to Defendant's residence.

At approximately 9:30 a.m., Agent Moultis and Corporal Hernandez approached the front door of Defendant's residence. Gov't Ex. 1-1 at 00:00. Agent Moultis was wearing a shirt that read "Police" across the chest, his law enforcement badge was visible around his neck, and he had a holstered firearm on his hip. *Id.* Corporal Hernandez knocked lightly on the door a few times and said "open the door" in Spanish. *Id.* at 00:00–01:30. Still speaking at a normal volume, Corporal Hernandez continued knocking lightly and said "Publisher's Clearinghouse." *Id.* at 01:31. The officers heard hushed voices and footsteps from inside, and Corporal Hernandez began knocking more forcefully and said "open the door or we are going to knock it down" in Spanish. *Id.* at 02:21–02:23. Corporal Hernandez described his tone as a "military cadence" and noted that he was speaking forcefully in order to bring someone to the door. Corporal Hernandez continued to knock on the door, and said something in Spanish beginning with "policia." *Id.* at 02:34.

Approximately two minutes and forty seconds after the officers arrived at the residence and began knocking, Ms. Powell[2] answered the door. *Id.* at 02:40. Corporal Hernandez asked Ms. Powell if she was home alone, and she responded that she was and asked if the officers were looking

---

[2] On January 6, 2016, Ms. Powell was engaged to Ismael Azua-Rinconada ("Azua-Rinconada") and the two were expecting a baby. They lived in the residence along with Defendant, his wife, and their two children. Defendant's wife is Azua-Rinconada's sister. Gov't Ex. 1-1 at 26:04–26:22. Azua-Rinconada is a defendant in another case in this district arising out of the same incident on January 6, 2016, *United States v. Azua-Rinconada*, No. 7:16-CR-5-FL-1.

3

for someone. *Id.* at 02:40–02:47. Agent Moultis said that he had heard other people inside and asked if the officers could come in and speak with her because it was cold outside. *Id.* at 02:47–03:00. Without delay, Ms. Powell said "okay, you can come in," opened the door wider, repeated the phrase, and gestured to the living room behind her. *Id.* at 03:00–03:05. Agent Moultis, Corporal Hernandez, and another officer entered the residence. However, Agent Moultis testified that based on the friendly nature of the encounter, the officers did not feel the need to do a safety sweep once they were inside. Agent Moultis again asked Ms. Powell if anyone else was in the home and she admitted that Defendant and Azua-Rinconada were also there. *Id.* at 3:13–03:32. The officers asked for everyone to gather in the living room (which was connected to an open kitchen) so they could all talk at once. *Id.* at 03:44–03:48. Since everyone spoke English, Corporal Hernandez did not have to provide much translation, and only clarified some words or phrases as needed.

Defendant emerged from his bedroom, shook hands with the officers, and took a seat on the couch. *Id.* at 03:48–04:04. The officers did not direct Defendant to take a seat or to sit in a particular place. *Id.* While Defendant and Ms. Powell were sitting on the living room couch, Agent Moultis explained that the officers were checking on "hot spots" and had received information that "illegal people" lived in the residence. *Id.* at 04:37–04:46. Agent Moultis said that the officers were not concerned about that information, but were focused on any guns that might be in the house because they had received tips about firearms being in the residence as well. *Id.* at 04:46–04:52. During this conversation, Azua-Rinconada emerged from his bedroom and sat next to Ms. Powell on the couch. *Id.* at 05:01–05:06. After having a short conversation about crime in the neighborhood, Agent Moultis asked if there were any drugs or guns in the residence and asked for permission to search the home. *Id.* at 06:30–06:34. Defendant stated that he rented the home and

4

admitted to having guns in the house, and the officers then gave him a consent to search form written in Spanish. *Id.* at 06:34–7:20. Defendant stood at the kitchen counter reviewing the consent to search form, then Corporal Hernandez filled in information such as the address of the residence. *Id.* at 09:00–11:03. While Defendant was reviewing the form, Agent Moultis was standing approximately one arm's length away from him but was not crowding him or keeping him confined to a certain area. Defendant signed the consent to search form and Agent Moultis witnessed the signature. *Id.* at 11:03-11:50; Gov't Ex. 2. Agent Moultis testified that Defendant thoroughly reviewed the consent to search form and took his time reading it. Both Agent Moultis and Corporal Hernandez testified that Defendant appeared to be understanding the conversation and seemed to be intelligent and mature.

With consent from Ms. Powell, the officers brought a canine unit inside the residence to assist with the search. Gov't Ex. 1-1 at 11:50–12:00. Defendant showed Corporal Hernandez where the firearms were located inside his bedroom and Corporal Hernandez then took the firearms to an officer outside to check the serial numbers. *Id.* at 12:00–14:00. After coming back into the living room, Defendant again sat on the couch with Ms. Powell and Azua-Rinconada without being directed where to sit by the officers. *Id.* Agent Moultis instructed Azua-Rinconada to fill out an immigration field questionnaire. *Id.* at 14:37–15:22. Agent Moultis used phrases such as "I want you to start filling this part out" and "why don't you go ahead and do that." *Id.* at 14:53–14:54, 15:21–15:22. Azua-Rinconada took the form from Agent Moultis and began answering the questions. *Id.* at 15:22–15:23. Agent Moultis then said to Defendant "why don't we come over here real quick, come over here to the kitchen table" and said that he would get a questionnaire for Defendant as well. *Id.* at 15:23–15:37. It does not appear from the video that Agent Moultis told Defendant where to sit at the kitchen table. Another officer took Defendant's identification to run

5

a record check.

At the square kitchen table, Defendant was seated with his back towards his bedroom wall, with Agent Moultis to his left, and Corporal Hernandez to the left of Agent Moultis. *Id.* at 15:37–15:57. They discussed the two firearms and during the conversation, Defendant volunteered to retrieve the paperwork for the pistol from his bedroom. Defendant retrieved the paperwork unaccompanied while the officers remained at the table. *Id.* at 16:24–16:44. Defendant stated that he bought the pistol from a co-worker and it had originally been purchased by the co-worker's mother. According to Defendant, he bought the pistol for protection since there are lot of drugs and robberies in his neighborhood and he has two daughters. *Id.* at 16-44–17:20. Agent Moultis and Defendant continued discussing the firearms and the neighborhood for a few minutes. *Id.* at 17:20–23:03. Another officer then approached the table and Agent Moultis explained to him what had been discussed with Defendant so far. *Id.* at 23:03–25:30. Agent Moultis stepped outside, and the other officer clarified Defendant's relationship with Azua-Rinconada and Ms. Powell. *Id.* at 25:42–26:33. Agent Moultis returned with a questionnaire for Defendant and stated "here brother—start filling out these questions, all of them" and "okay, if they don't apply to you, like I mean maybe you've never been deported or anything like that, you know what I mean, it's got a bunch of questions . . . so just if they don't, put 'no' or 'n/a' . . . ." *Id.* at 26:33–27:40. Agent Moultis left the table to speak with Azua-Rinconada, who was still seated on the couch, and the other officer informed Defendant that they would help him if he had any questions while completing the questionnaire. *Id.* at 27:40–27:44. Defendant remained seated at the kitchen table across from Corporal Hernandez while he read through the questionnaire. The other officer remained standing beside Defendant in the kitchen, approximately one to two arm's length away from him. *Id.* at 27:44–28:55.

6

Agent Moultis testified that he instructed Defendant to fill out the questionnaire, but his mannerisms and demeanor turned the instruction into a request, based on the casual nature of the encounter and his tone of voice. Agent Moultis was in his unmarked police van outside, having taken Azua-Rinconada's fingerprints, when Defendant was brought outside to have his fingerprints processed as well. Agent Moultis did not believe that Defendant was brought out in handcuffs, because he did not remember removing any handcuffs to take Defendant's fingerprints. He testified that an officer would have had to point out the van to Defendant, as it was not clearly identifiable as a law enforcement vehicle, but he did not believe Defendant was escorted in custody to the van. However, after Defendant had completed the questionnaire, the officers would have had authority to administratively detain Defendant because the questionnaire revealed that Defendant had entered the United States without inspection and because Defendant was unlawfully in the country and in possession of a firearm. Defendant does not appear in the footage contained in Gov't Ex. 1-2, and he is last seen on the video sitting at the kitchen table across from Corporal Hernandez.

## III. DISCUSSION

### A. Motion to Disclose Confidential Informant [DE-32]

Defendant seeks a court order directing the Government to reveal the identity of the confidential informant (including his or her name, address, birth date, telephone number, and social security number) whose information prompted HSI to conduct the knock and talk operation at Defendant's residence on January 6, 2016, or in the alternative, dismissal of the case should the Government refuse to disclose the informant's identity. Def.'s Mot. [DE-32]. Specifically, Defendant argues that the relevant factors weigh in favor of disclosure of the informant's identity where the informant is the only witness to the alleged criminal activity occurring at Defendant's residence; the informant may be an actual participant in similar acts which the Government may

7

attempt to produce at trial as Rule 404(b) evidence; and the informant may have some ill will towards Defendant (either as a competitor or as someone who is also subject to similar prosecution and is attempting to obtain favorable treatment by cooperating with the Government). *Id.* at 2-5. The Government describes the information provided by the informant as follows:

> In 2015 a confidential informant (CI) working for [HSI] provided information that a certain mobile home located at New Mexico Drive, Red Springs, in Robeson County, North Carolina, was a distribution point for marijuana. This CI was vetted with a positive track record for three years. The area in general was also known to HSI as a region with known drug and firearms ties.
>
> On January 6, 2016, HSI agents executed a knock and talk operation at the above-described residence in order to determine if historical information provided was accurate.

Gov't Resp. [DE-35] at 1-2 (internal footnotes omitted). The Government argues that disclosure of the confidential informant is not required where the agents were authorized to knock on Defendant's door regardless of any information provided by the informant and that information was not used as part of a reasonable suspicion or probable cause formulation. *Id.* at 5-7.

There is no fixed rule to determine whether disclosure of a confidential informant's identity is required, but rather the court must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro v. United States*, 353 U.S. 53, 62 (1957). "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* "The Fourth Circuit has held that 'when the informant is an active participant in the transactions at issue instead of just a mere tipster, the failure to require disclosure of the informant's identity is more likely to amount to error.'" *United States v. Howard*, No. 5:12-CR-9-D, 2012 WL 2525625, at *4 (E.D.N.C. June 29, 2012) (unpublished) (quoting *United States v. Blevins*, 960 F.2d 1252, 1258

8

(4th Cir. 1992) & citing *United States v. Price*, 783 F.2d 1132, 1138-39 (4th Cir. 1986)). "This is particularly true in cases where the informant is the only witness other than the defendant who has first hand knowledge of critical portions of the criminal activity." *Blevins*, 960 F.2d at 1258 (citing *Roviaro*, 353 U.S. at 63-64; *Price*, 783 F.2d at 1139). However, "[d]isclosure is not required despite the fact that a criminal defendant may have no other means of determining what relevant information the informant possesses" and "[t]he defendant must come forward with something more than speculation as to the usefulness of such disclosure." *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir. 1985) (citations omitted). "Disclosure is only required after a court has determined that the informer's testimony is highly relevant." *Id.* (citation omitted). "The decision of whether the testimony of the informer will be relevant and helpful is usually within the trial judge's discretion." *Id.* (citation omitted).

Here, Defendant can only speculate that the informant is the sole witness to the alleged criminal activity occurring at his residence, and Defendant's additional arguments in support of disclosure—that the informant may be a participant in acts that might be introduced as Rule 404(b) evidence at trial or that the informant may be a competitor himself subject to prosecution who is seeking to cooperate with the Government—are based on speculation as well. Def.'s Mot. [DE-32]. Thus, there is no indication that the confidential informant here was a participant in the alleged criminal activity, and an informant's status as a tipster, while not dispositive, is significant and weighs against requiring disclosure. *See United States v. Vega*, 120 F. App'x 457, 460 (4th Cir. Jan. 27, 2005) (unpublished) ("[T]he informant's role in the specific investigation is one factor under the balancing test . . . .") (citing *Blevins*, 960 F.2d at 1259 (citing *Price*, 783 F.2d at 1138-39)); *United States v. Gray*, 47 F.3d 1359, 1365 (4th Cir. 1995) (characterizing the informant's involvement in the criminal acts of the accused as an "important factor affecting disclosure").

9

In contrast, in *Roviaro*, the Supreme Court reversed the defendant's conviction for selling heroin to a confidential informant identified as "John Doe" and for facilitating the transportation and concealment of heroin, holding that the trial court's failure to require disclosure of the confidential informant's identity was error. 353 U.S. at 55. There, the confidential informant "had helped to set up the criminal occurrence and played a prominent part in it" and "[s]o far as [the defendant] knew, he and John Doe were alone and unobserved during the crucial occurrence for which he was indicted. Unless [the defendant] waived his constitutional right not to take the stand in his own defense, John Doe was his one material witness." *Id.* at 64. While in *Roviaro* it was clear that the confidential informant was the sole participant other than the defendant in the criminal activity where that activity was a drug sale between two individuals, here the tip at issue is that Defendant's residence was associated with marijuana distribution and it is not clear that the informant was personally involved in the alleged activity or was the sole participant other than Defendant. *See* Gov't's Resp. [DE-35] at 1. Thus, this is not a case where disclosure is mandated because "a confidential informant has participated in the charged offense, and the informant was the only participant other than the accused . . . ." *United States v. Martinez*, 286 F. App'x 809, 815 (4th Cir. June 24, 2008) (unpublished) (per curiam) (citing *McLawhorn v. State of North Carolina*, 484 F.2d 1, 8 n.19 (4th Cir. 1973)).

The confidential informant in the instant case appears to be substantially less significant than the informant in *Roviaro*, and additionally here, the officers investigated Defendant's residence by utilizing a knock and talk encounter, where no reasonable suspicion or probable cause was required. *See United States v. Poms*, 484 F.2d 919, 922 (4th Cir. 1973) (per curiam) (upholding the trial court's refusal to order disclosure of a confidential informant's identity where the informant provided information utilized by officers to perform a protective search, and noting that "the

Government is permitted to withhold the identity of informants when 'the information was used only for the limited purpose of obtaining a search warrant.'") (citing *United States v. Fisher*, 440 F.2d 654, 656 (4th Cir. 1971); *United States v. Pitt*, 382 F.2d 322 (4th Cir. 1967); *United States v. Whiting*, 311 F.2d 191 (4th Cir. 1962)). Where the Government may properly protect the identity of a confidential informant whose information was used for the limited purpose of obtaining a search warrant, it follows that disclosure is not required where information provided by an informant led to further investigation in the form of a consensual knock and talk encounter. Under the circumstances presented here, Defendant has failed to carry his burden of demonstrating that the confidential informant's testimony is "highly relevant," *Smith*, 780 F.2d at 1108, and accordingly "the public interest in protecting the flow of information" outweighs Defendant's right to disclosure, *Roviaro*, 353 U.S. at 62. Defendant's motion to disclose the identity of the confidential informant [DE-32] is thus denied.

### B.   Motion to Suppress [DE-31]

Defendant has moved to suppress all evidence, both physical and testimonial, and any resulting fruits thereof, obtained as a result of an unlawful search, seizure, interrogation, arrest, and detention which occurred at his residence on January 6, 2016. Def.'s Mot. [DE-31]. Defendant asserts that suppression is required by the Fourth and Fifth Amendments to the United States Constitution and *Miranda v. Arizona*, 384 U.S. 436 (1966). *Id.* Specifically, Defendant argues that he did not give voluntary consent to search his residence and he was subject to custodial interrogation without receiving *Miranda* warnings. *Id.* In response, the Government contends that Defendant voluntarily consented to the search of his residence and he was not subject to custodial interrogation during the encounter on January 6, 2016. Gov't Resp. [DE-36]; Gov't Suppl. Resp. [DE-50]. Alternatively, the Government argues that even if Defendant was seized, officers had

11

authority to detain and question him pursuant to immigration law in order to determine his immigration status. *Id.*

### 1. Consent to Search

Defendant argues that he did not give voluntary consent to search his residence as it was the product of duress and coercion from law enforcement and was essentially a "warrantless search under the guise of a knock and talk." Def.'s Mot. [DE-31] at 6-9. Defendant contends that the officers were only invited inside after Corporal Hernandez threatened to break down the door; after the occupants were forced to gather in the living room, while multiple officers stood over them as they were seated on the couch; and Defendant only signed the consent to search form after officers stood over him for several minutes and he was never told of his right to refuse consent. *Id.* In response, the Government argues that Ms. Powell provided voluntary consent for the officers to enter even after hearing the statement about breaking down the door, Gov't Resp. [DE-36] at 5-7; and Defendant's consent to search was voluntary where it was written in Spanish; Corporal Hernandez was there to assist Defendant with translation and did provide assistance; Defendant took ample time to review the form independently; and the video of the encounter shows no coercion or pressure on Defendant to sign the form and grant consent, Gov't Suppl. Resp. [DE-50] at 2-5.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Accordingly, a search conducted without a warrant issued upon a showing of probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). Valid consent is one such exception to the Fourth Amendment's general warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (citations omitted); *Trulock v. Freeh*, 275 F.3d 391, 401

12

(4th Cir. 2001) (citation omitted). In order to be valid, consent must be knowing and voluntary, and the determination of whether consent was voluntary is based on the totality of the circumstances. *United States v. Buckner*, 473 F.3d 551, 554-55 (4th Cir. 2007) (citations omitted); *United States v. Boone*, 245 F.3d 352, 361 (4th Cir. 2001) (citations omitted). The Government has the burden of establishing valid consent to search, which it must show by a preponderance of the evidence. *Buckner*, 473 F.3d at 554 (citation omitted).

> Factors that are appropriate for the district court to consider include the characteristics of the accused (such as age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). Whether the accused knew he possessed a right to refuse consent is a relevant factor, but the government need not demonstrate that the defendant knew of his right to refuse consent to prove that consent was voluntary. Written consent supports a finding that the consent was voluntary. Consent given while in custody may still be voluntary.

*Boone*, 245 F.3d at 361-62 (internal citations omitted). However, the burden of proving voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (holding that consent was involuntary where police officers falsely represented to a homeowner that they had a search warrant for the home and then asked for consent to search) (footnote omitted); *see also Florida v. Bostick*, 501 U.S. 429, 438 (1991) ("'Consent' that is the product of official intimidation or harassment is not consent at all."). Further, "[c]onsent may be inferred from actions as well as words." *United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003) (citations omitted).

Voluntary consent cannot be "coerced by threats or force, or granted only in submission to a claim of lawful authority . . . ." *Schneckloth*, 412 U.S. at 233 (citations omitted); *see Gregg v. Ham*, 678 F.3d 333, 337, 342 (4th Cir. 2012) (holding consent was involuntary where a physically disabled woman was alone in her bed at 7:30 a.m. when a bail bondsman, armed with a shotgun,

13

along with a deputy and two other bondsmen, violently shook the door and warned plaintiff that she "had to let them come in or he was going to come in" and plaintiff did not know that an officer was present before opening the door); *United States v. Elie*, 111 F.3d 1135, 1145-46 (4th Cir. 1997) (holding consent was voluntary even though at least six officers were present when the defendant granted consent to search and noting that the absence of *Miranda* warnings is another factor to be considered in assessing voluntariness and "neither the drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in and of itself.") (internal quotation marks, alterations, and citations omitted), *abrogated in part on other grounds by Dickerson v. United States*, 530 U.S. 428 (2000); *United States v. Alvarez-Herrera*, No. 5:13-CR-61-FL, 2013 WL 6531175, at *23 (E.D.N.C. Dec. 12, 2013) (unpublished) (holding consent was voluntary where the defendant was asked for and gave consent in his native language in the presence of only two officers, the officers made no false or misleading statements suggesting that the defendant could not refuse consent, and the defendant had been cooperative in complying with the officers' requests throughout the encounter); *United States v. Hernandez Sanchez*, No. 5:11-CR-65-FL, 2011 WL 3420605, at *9 (E.D.N.C. July 8, 2011) (unpublished) (holding consent was voluntary where "there [were] no known characteristics of the defendant, such as age, maturity, education, intelligence, and experience, that suggest consent was involuntary," Defendant had a high school education, owned a business, and could converse intelligently with the officers, and officers did not use threatening language or raised voices, even though the defendant "was subject to a pat-down search, there were up to seven officers present[,] the encounter took more than a few minutes and . . . officers had blocked in [the defendant's] vehicle with at least three of their own vehicles."), *adopted by* 2011 WL 3420598 (E.D.N.C. Aug. 4, 2011).

Having considered the relevant factors and the totality of the circumstances, Defendant gave

14

voluntary and knowing written consent to search his residence on January 6, 2016. As in *Hernandez Sanchez*, "there are no known characteristics of the [individual], such as age, maturity, education, intelligence, and experience, that suggest consent was involuntary." 2011 WL 3420605, at \*9. For example, Defendant is an adult who was able to converse with the officers and has lived in the United States and worked at the same construction job for several years. Both Agent Moultis and Corporal Hernandez testified that Defendant appeared to be intelligent and mature. Although six officers were on site and some had sidearms visible, it appears that at most, three or four officers were inside with the occupants of the residence at any given time. Further, none of the officers drew his weapon, raised his voice, or threatened any of the occupants in any way. *See Elie*, 111 F.3d at 1145 (holding that the defendant's consent was voluntary although six officers were present, and the arresting officer had previously drawn his sidearm and handcuffed defendant). Where consent can be voluntary when one individual is in the presence of six officers, it follows that voluntary consent can be given where three occupants of a residence are in the presence of three to four officers throughout an encounter. Defendant spoke English fairly well, and Corporal Hernandez and Ms. Powell both translated words or phrases for him as needed. Corporal Hernandez testified that he clarified some parts of the conversation for Defendant, and believed that Defendant was understanding their discussion. Additionally, Defendant evidenced his consent in writing in his native language. *See Alvarez-Herrera*, 2013 WL 6531175, at \*23 (holding consent was voluntary where the defendant was asked for and gave consent in his native language); *Boone*, 245 F.3d at 362 ("Written consent supports a finding that the consent was voluntary.") (citation omitted). The encounter took place beginning at 9:30 a.m., when it was light outside, and lasted less than 45 minutes. Defendant was in his own home, along with two family members. *See Boone*, 245 F.3d at 361-62 (listing, as factors to be considered in the voluntary consent analysis, the conditions under

15

which consent was given and the duration of the encounter).

To be sure, there are some factors here that would support a finding that Defendant did not give voluntary and knowing consent. For example, Corporal Hernandez announced loudly in Spanish "open the door or we are going to knock it down" prior to entering the home. However, Defendant does not directly allege that Ms. Powell did not give voluntary consent for the officers to enter the residence and while this statement may weigh against a finding that Defendant gave voluntary consent, it is not dispositive. This statement's importance is also undercut by the fact that the officers asked permission to enter the home after Ms. Powell opened the door. Additionally, none of the officers told Defendant he had the right to refuse granting consent to search the residence. *See Boone*, 245 F.3d at 361-62 (noting that whether the consenting party was informed of the right to refuse is a relevant factor, but is not determinative). To the extent that Defendant argues that officers stood menacingly over the occupants of the home while they were seated on the couch or over him while he stood at the kitchen counter reading the consent form, the video footage of the encounter dispels this argument. The video reveals the officers standing close to the occupants due to space constraints, but does not show any of the officers crowding or looming over Defendant or any of the other occupants. Nor did any of the officers force any occupants of the residence to move to a certain place. Indeed, throughout most of the encounter, the officers kept a respectful distance of at least an arm's length from the occupants. At times, Defendant and Azua-Rinconada left the presence of the officers and went unaccompanied to other rooms.

While Defendant argues that this case is analogous to *United States v. Robertson*, 736 F.3d 677 (4th Cir. 2013), the factual circumstances in that case are markedly different from the facts at hand. In *Robertson*, the court noted that the decision highlighted "the difference between voluntary consent to a request versus begrudging submission to a command." *Id.* at 680. The defendant in

that case was seated in an enclosed bus shelter at night, and was blocked in by a marked police car. *Id.* "Surrounded by police officers, Mr. Robertson watched as every individual in a bus shelter next to him was handled by the police." *Id.* at 681. As an officer approached Mr. Robertson,

> [t]he officer's questioning was immediately accusatory. Officer Welch's first question was whether Mr. Robertson had anything illegal on him. When Mr. Robertson responded with silence, the officer waved Mr. Robertson forward and asked to conduct a search. Mr. Robertson's exit was blocked by Officer Welch, who never informed Mr. Robertson that he had the right to refuse the search. Officer Welch's initial, accusatory question, combined with the police-dominated atmosphere, clearly communicated to Mr. Robertson that he was not free to leave or to refuse Officer Welch's request to conduct a search.

*Id.* at 680 (internal citations omitted). Importantly, in *Robertson*, the request for consent to search occurred as Officer Welch was already waving Mr. Robertson forward to perform the search. *Id.* at 679. The court specifically noted that Mr. Robertson did not give either verbal or written consent and the fact that the encounter took place at night, and commented on the lack of "relaxed, friendly conversation" between those involved. *Id.* at 681 (citations omitted). In contrast, here, Defendant provided written consent to search and was not subject to the same type of restraining, police-dominated atmosphere as Mr. Robertson, who was blocked into a closed bus shelter by a police vehicle. Additionally, the conversation between Defendant and the officers was never hostile or accusatory. Throughout the encounter, Defendant appeared to be calm, cooperative, and pleasant while speaking and interacting with the officers. Indeed, he had already told the officers he possessed two firearms and appeared willing to retrieve them prior to the discussion of granting consent to search. *See Elie*, 111 F.3d at 1145 (noting that a conversational tone between officers and the subject of the search is a relevant factor that supports consent being given voluntarily). None of the officers used threatening or coercive language, nor did they make any false statements regarding their right to search Defendant's residence. *Cf. Bumper*, 391 U.S. at 546-47, 550 (holding that consent was not knowing and voluntary when officers were permitted to enter a home after one

17

officer falsely claimed to have a search warrant). Defendant thoroughly reviewed the consent to search form, which was written in his native language, and spoke with Corporal Hernandez in Spanish prior to signing it. Thus, given the totality of the circumstances, Defendant gave knowing and voluntary written consent for the officers to search his residence.

## 2. Custody

Defendant argues that he was subject to custodial interrogation during the encounter at his residence and all statements, including his verbal statements and written answers to the immigration questionnaire, should be suppressed. Def.'s Mot. [DE-31] at 9-12. Specifically, Defendant argues that he was in custody because he was separated from the other occupants and removed from the living room for questioning in the kitchen; he was surrounded at the kitchen table by officers and was blocked into the corner; and additional officers stood over him while he was seated at the kitchen table, further blocking any possible exit. *Id.* In response, the Government contends that Defendant was never in custody because his freedom of movement was not restricted; he was interviewed at his own kitchen table; and no one was placed in restraints or told that they could not leave during the encounter. Gov't Resp. [DE-36] at 7-8. The parties do not dispute that Defendant was never read his *Miranda* rights on January 6, 2016, nor was he told that he was not under arrest and was free to leave.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. To protect this right, the Supreme Court adopted in *Miranda*, 384 U.S. at 478-79, several procedural rules governing custodial interrogations, that is, interrogations conducted after a suspect has been formally arrested or "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). Prior to any questioning, an individual in

18

custody must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him . . . ." *Miranda*, 384 U.S. at 478-79. Any statement elicited in violation of these procedural rules is inadmissible in the prosecution's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (citing *Harris v. New York*, 401 U.S. 222 (1971)). The question for resolution here is whether Defendant was in custody at any point on January 6, 2016, as it is clear that he was subject to interrogation and was not read his *Miranda* rights. If Defendant was not in custody, then no *Miranda* warnings were required. *See United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (holding statements were admissible despite absence of *Miranda* warnings where defendant was not in custody during questioning).

An individual is in custody for *Miranda* purposes when he is formally arrested or his "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotation marks and citation omitted). The custody inquiry is objective: the question is not whether the suspect or the interrogating officer believes that the suspect was in custody, but whether a reasonable person in the suspect's position would have understood that he or she was in custody. *Id.* at 442; *accord United States v. Hargrove*, 625 F.3d 170, 181-82 (4th Cir. 2010) (giving limited consideration to the defendant's testimony about his subjective feelings in considering whether he was in custody) (citing *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) ("Subsequent testimony by an accused about his prior subjective mental impressions and reactions must be carefully scrutinized, as such testimony is always influenced by his self-interest.") (internal quotation marks, citations, and alterations omitted)). Since the determination of whether an individual is in custody is a fact-intensive inquiry, this determination must be made on a case-by-case basis based on the "totality of the circumstances."

19

*United States v. Jones*, 818 F.2d 1119, 1123-24 (4th Cir. 1987) (quoting *California v. Beheler*, 463

U.S. 1121, 1125 (1983)). A court must first examine all of the circumstances surrounding the

interrogation and then determine, under those circumstances, whether "a reasonable person would

have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v.

Keohane*, 516 U.S. 99, 112 (1995), *superseded on other grounds by statute*, 28 U.S.C. § 2254(d).

There are numerous factors to be considered in making a custody determination, including, but not

limited to:

> (1) Whether defendant was informed that he was not under arrest and that he was
> free to terminate the questioning;
>
> (2) Whether defendant possessed unrestrained freedom of movement during
> questioning;
>
> (3) Whether defendant voluntarily submitted to questioning;
>
> (4) Whether the agents employed strong arm tactics or deceptive stratagems during
> questioning;
>
> (5) Whether the atmosphere of the questioning was police-dominated; and
>
> (6) Whether defendant was placed under arrest at the termination of the questioning.

*United States v. Jefferson*, 562 F. Supp. 2d 707, 713-14 (E.D. Va. 2008) (internal footnotes and

citations omitted); *see also United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010) ("Among the

facts to be considered are 'the time, place and purpose of the encounter, the words used by the

officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the

potential display of a weapon by an officer, and whether there was any physical contact between the

officer and the defendant.'") (quoting *United States v. Weaver*, 282 F.3d 302, 312 (4th Cir. 2002)).

It is important to note that the environment does not have to be entirely free of coercion in

order to be non-custodial—indeed, "[a]ny interview of one suspected of a crime by a police officer

will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law

20

enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495. However, in cases where the Fourth Circuit has determined that an individual was subject to custodial interrogation, something more has been present beyond the naturally-occurring coercive aspects of being questioned by a police officer. *See United States v. Hashime*, 734 F.3d 278, 282-86 (4th Cir. 2013) (holding that the defendant was subjected to custodial interrogation where he was awoken naked, at gunpoint, after 15-30 officers swarmed his family's home armed with a battering ram in the early morning hours, ordered everyone outside in the cold even though some people were in pajamas, and defendant was questioned in a basement storage room for three hours by two agents); *United States v. Colonna*, 511 F.3d 431, 434-36 (4th Cir. 2007) (holding that an interrogation was custodial and "occurred in a police dominated environment where the agents did everything to make . . . any reasonable man believe that he was not free to leave," where 24 officers swarmed Colonna's home in the early morning hours, awoke him at gunpoint after kicking his bedroom door open, restricted his family's access to their home, kept Colonna under constant guard, and two armed officers interrogated him for three hours in a police vehicle even though he was told he was not under arrest). Further, in *Hashime*, the officers told the defendant that he had to remain under guard and despite telling him that he did not have to answer their questions, was not under arrest, and he could leave, also told the defendant that they needed to know the truth and he needed to be completely honest even if he was afraid or did not want to answer the questions. 734 F.3d at 282-86.

The location of the questioning is also an important consideration in the totality the circumstances analysis: "an interview at the suspect's residence tends to be more neutral than one that occurs at a law enforcement facility. A more relaxed environment usually indicates less formal police control over . . . the defendant, and thus suggests a setting that is not of the degree typically

21

associated with a formal arrest." *Hargrove*, 625 F.3d at 177-82 (collecting cases) (holding a two-hour interview was non-custodial where 10-15 officers arrived in the early morning hours to execute a search warrant, officers had weapons drawn during an initial security sweep, the defendant was subject to a pat-down search, officers told him he was free to leave, the defendant was interviewed by two officers in his kitchen and never asked for the questioning to stop or refused to answer, the defendant was not handcuffed, no weapons were drawn during the interview, and the defendant was permitted to move around his house if it did not interfere with the search); *see also Parker*, 262 F.3d at 417-19 (holding that a 30-minute interview with two agents in a bedroom with the door closed was not custodial where six or seven agents arrived at the defendant's home in the early morning hours, the defendant was neither handcuffed nor restrained, no weapons were drawn in her presence, one of her relatives requested to enter the bedroom during the question and was allowed to do so twice, and the defendant was not forced to go into the room with the officers and was never told that she was not free to leave).

Here, considering the relevant factors and the totality of the circumstances, Defendant was not in custody on January 6, 2016. The officers spoke with Defendant at his kitchen table mid-morning, when it was light outside; after entering the residence, Agent Moultis and Corporal Hernandez introduced themselves, explained their purpose, and asked for everyone in the trailer to come to the living room without conducting a security check; the officers did not raise their voices, brandish their weapons, touch anyone in the house, direct Defendant where to sit, or place anyone in handcuffs; and they asked permission for additional officers to enter the residence. *See Day*, 591 F.3d at 696 (listing factors for the court to consider when completing a totality of the circumstances custody analysis); *Hashime*, 734 F.3d at 284 (noting that a family's loss of control over their home—such as being forced to stand outside—is suggestive of a custodial situation). Throughout

22

the encounter, Agent Moultis and Corporal Hernandez used instructive phrases and requests, instead of commands, such as "would you mind if we search?" and "here brother—start filling out these questions" and at no point during any of the conversation did Defendant protest or refuse to comply with the officers' requests. The video footage of the encounter demonstrates that Agent Moultis' tone and demeanor are more akin to requests than commands.

Some factors would support a finding of custody here, for example, that Defendant was never advised that he was not under arrest or was free to leave; three officers entered the residence with visible weapons; and Agent Moultis implied Defendant was a suspect by saying he had received a tip that the "illegal people" living at the New Mexico Drive residence were distributing marijuana, he asked to search the residence for illegal drugs and firearms, and requested that Defendant fill out an immigration questionnaire. *See United States v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997) (noting that an officer telling the individual being questioned that he is a suspect is a relevant but not a determinative factor in a custody analysis); *Davis v. Allsbrooks*, 778 F.2d 168, 171-72 (4th Cir. 1985) (noting that a suspect being advised that he is not under arrest is a relevant but not determinative factor in a custody analysis).

While Defendant argues that he was isolated from the other occupants of the residence and surrounded by officers at the kitchen table, this argument is belied by the video footage of the encounter. Defendant was seated with at most two officers at the kitchen table, and at times a third officer stood nearby in the kitchen. However, none of the officers crowded Defendant or restrained him to the table—indeed, during the questioning, Defendant rose and walked unaccompanied to his bedroom. Further, Defendant joined in at times with the conversation taking place in the living room. Defendant's argument is also undercut by the fact that the trailer has an open layout, such that the kitchen and living room are not truly separate spaces. This is vastly different than the

23

situation in *Hashime*, where the court found that the defendant was in custody when he was separated from his family members and questioned in a basement storage room for three hours. 734 F.3d at 282-86. The instant case is more similar to the factual scenario depicted in *Hargrove*, where the court held the defendant was not in custody when he was interviewed by two officers at his kitchen table for two hours, never asked for the questioning to stop or refused to answer, was not handcuffed, no weapons were drawn, and the defendant was permitted to move about his house. 625 F.3d at 177-82. Similarly here, Defendant was not isolated from Azua-Rinconada and Ms. Powell, was permitted to move around the house, was not restrained or handcuffed, and did not try to end the conversation at any point. Accordingly, under the totality of the circumstances, Defendant's freedom of action was not "curtailed to a degree associated with formal arrest[,]" and he was not in custody on January 6, 2016. *Berkemer*, 468 U.S. at 440.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Disclose Confidential Informant [DE-32] is DENIED and the undersigned RECOMMENDS that Defendant's Motion to Suppress [DE-31] be DENIED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **Friday, January 27, 2017** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules),

24

72.4(b). Any response to objections shall be filed by within **14 days** of the filing of the objections.

If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

SO ORDERED and SUBMITTED, the 13th day of January 2017.

Robert B. Jones, Jr.
United States Magistrate Judge